
ORIGINAL

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 13 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA
v.

CLIFFORD HARRIS
a/k/a "T.I."

CRIMINAL COMPLAINT

CASE NUMBER: 1:07-MJ-1197

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>October 13, 2007</u> in <u>Fulton</u> County, in the Northern District of Georgia defendant did,

knowingly possess firearms, to-wit: machine guns and silencers, not registered to him in the National Firearms Registration and Transfer Record; and did knowingly possess in and affecting interstate commerce firearms after having been convicted of a felony, that is, a crime punishable by a term exceeding one year,

in violation of Title <u>26,</u> United States Code, Section 5861(d), and Title <u>18</u>, United States Code, Section 922(g).

I further state that I am a Special Agent and that this complaint is based on the following facts:

Please See Attached Affidavit

Continued on the attached sheet and made a part hereof.    (X) Yes ( ) No

_____
Signature of Complainant
Jason S. Stricklin

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

October 13, 2007                                      at    Atlanta, Georgia
Date                                                              City and State

Linda T. Walker
United States Magistrate Judge
Name and Title of Judicial Officer                          Signature of Judicial Officer
AUSA Francey Hakes

## **AFFIDAVIT**

I, Jason S. Stricklin, being duly sworn depose and state the following:

1. Your affiant is currently employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Atlanta Field Division, Atlanta Group I, and has been so employed since 2005. Your affiant has received training from ATF in the registration, possession, and identification of machineguns and silencers. Your affiant has conducted and participated in numerous investigations involving Federal firearms violations to include violations of Title 18 and Title 26 of the United States Code. Your affiant's duties and responsibilities involve investigations of violations of Federal criminal laws and your affiant knows that it is a violation of Title 26, United States Code, Section 5861(d), for any person to receive or possess a firearm that is not registered to him in the National Firearms Registration and Transfer Record. Your affiant also knows that it is a violation of Title 18, United States Code, Section 922(g) for a person previously convicted of a felony to be in possession of a firearm.

2. This affidavit is being filed based on the personal knowledge and observations of the affiant and other law enforcement personnel, and interviews with witnesses, and reviews of government and business records, including records, reports, and information from the ATF. This affidavit is intended to support probable cause but it is not intended to convey all the facts of the investigation.

1

3. On October 2, 2007, an employee of a Federal Firearms Licensee (FFL) contacted ATF with information regarding an individual who had been inquiring about purchasing a machine gun without registering the weapon as required by law. This individual, who is now a cooperating individual (hereinafter "CW"), was identified by the FFL by name and other identifying information. ATF Agents provided an undercover cellular phone number for the FFL to give to the CW, and told the FFL to tell the CW the number would contact a person with machine guns for sale. The aforementioned cellular telephone number returned to an ATF agent, acting in an undercover capacity (U/C Agent), posing as a "machine gun" seller/dealer. Within hours of receiving the cellular number, the CW telephoned the U/C and had a discussion about the firearms he (U/C) had available for sale. During the conversation, the CW asked if the firearms were "fully" automatic. The CW told the U/C that he was interested in purchasing the machine guns.

4. On October 10, 2007, the U/C contacted the CW and asked him if he was still interested in meeting to purchase the machine guns. the CW stated that he was and agreed to meet at a K-Mart Shopping Plaza located at 5997 Buford Highway, Doraville, Georgia. At approximately, 4:40 p.m., the CW arrived and met with the U/C to observe the firearms, which were actual machine guns. The CW had a further discussion about the firearms firing "fully" automatic. The CW agreed to exchange $2200 and a Bushmaster, Model C-15, .223 caliber pistol, s/n D10867 for the following firearms: an Ingram, Model M-10, 9mm caliber machine gun, s/n 2-3005561, an SWD Inc., 9mm silencer, s/n N767, a Military Armament Corp., 9mm silencer, s/n 2-2001231, a SWD Inc., Model M-11, 9mm

caliber machine gun, s/n 86-0008212 and a H&K, Model SP89, 9mm caliber machine gun, s/n 21-17411.

5. During the meeting between the U/C and the CW, the CW questioned the U/C if he (the CW) would get into trouble if law enforcement caught him in possession of the machine guns. The U/C told the CW that the firearms were not legal to possess without the proper paperwork because they had to be registered. The U/C further told the CW there would be a problem if he were caught with them. The U/C told the CW that the aforementioned firearms did not have the required legal paperwork. The CW indicated that he understood and stated that he wanted to purchase the firearms anyway. The exchange of money and guns then took place. The firearms were not registered to the CW in the National Firearms Registration and Transfer Record, nor had the CW applied for the proper paperwork.

6. Following the transfer of the machine guns from the U/C to the CW, the CW was arrested. After his arrest, the CW agreed to speak with agents. During this and subsequent interviews with the CW, the CW told agents the following:

   a. The CW stated that he was purchasing the machine guns on 10/12/07 on behalf of another person. The CW stated that he knew it was illegal for him to possess machine guns without properly registering them. The CW said he was buying the machine guns and silencers for CLIFFORD HARRIS, a/k/a "T.I." for whom the

3

CW had been working as a bodyguard since July of 2007. The CW admitted to straw purchasing approximately nine (9) firearms for HARRIS and approximately seventeen (17) additional firearms for individuals other than HARRIS. [Review of records of firearms purchases, ATF Forms 4473, has confirmed that the CW has purchased approximately 25 firearms over the last 18 months.] The CW said that HARRIS gave him cash to buy guns for HARRIS on four different occasions. HARRIS is prohibited from purchasing firearms for himself because he has been convicted of a felony offense, so he asked the CW to purchase the firearms for him (HARRIS). [It is a violation of federal law for a prohibited person, such as a convicted felon, to have another person purchase or acquire firearms for the prohibited person.]

b. On 9/6/07, HARRIS gave the CW cash and asked the CW to buy a Calico 9mm caliber pistol. [The CW is not a convicted felon or otherwise prohibited from purchasing firearms.] The CW bought the pistol at The Gun Store, a federal firearms licensee (FFL), and gave the firearm to HARRIS at his home at 429 Creekview Lane, College Park, Georgia. The CW said that HARRIS resides at 429 Creekview Lane, College Park, Georgia. [Investigation of public records confirmed that 429 Creekview Lane, College Park, Georgia, is a residence associated with HARRIS. This address is within the Northern District of Georgia.] On the same date, when the delivery of the Calico 9mm pistol occurred, HARRIS invited the CW into his bedroom at the house and showed the CW a safe

in his (HARRIS's) bedroom. The CW observed the safe inside a walk-in closet in the bedroom. The safe was tall enough for a person to enter, and the CW witnessed HARRIS open the safe using a fingerprint- reading scanner type lock, and possibly a keypad as well. Inside the safe, the CW saw multiple short rifles. HARRIS showed the CW an assault-type rifle in a black bag inside the safe. HARRIS told the CW the weapon was a machine gun.

c. On 9/18/07, HARRIS gave the CW $1000 in cash and asked him to buy a Smith & Wesson .500 caliber revolver. An associate of HARRIS's known as "ALPHAOMEGA" followed the CW to The Gun Store. The CW purchased the revolver at The Gun Store and gave it to "ALPHAOMEGA" to give to HARRIS.

d. On or about 9/26/07, HARRIS called the CW and told him that he (HARRIS) wanted the CW to acquire more firearms for him. HARRIS specifically asked the CW to purchase a Smith & Wesson .460 caliber revolver for him. HARRIS gave $7000 in cash to an associate known as "C-ROD" to give to the CW. The CW went to The Gun Store and purchased 7 firearms, (3 rifles and 4 handguns), including the Smith & Wesson .460 caliber revolver. The CW delivered all 7 firearms to HARRIS at HARRIS's house on Creekview Lane. After the CW brought the aforementioned 7 firearms to HARRIS's house, HARRIS directed the CW to bring the guns to HARRIS's bedroom. The CW gave HARRIS the firearms in HARRIS's bedroom. The CW observed HARRIS handle the firearms. [The purchases of firearms by the CW on 9/6/07, 9/18/07, and 9/26/07 were

confirmed by ATF agents by reviewing ATF Forms 4473, obtained from The Gun Store.]

e. The CW said that on 10/10/07, HARRIS arranged for the CW to pick up $12,000 in cash from HARRIS's bank - the SunTrust Bank on Northside Parkway in Atlanta. HARRIS instructed the CW to meet with a specific bank employee to get the cash. The CW went to the bank, met with the bank employee, and was given the cash by that bank employee. HARRIS told the CW to use the funds to purchase machine guns for HARRIS. [Investigation has confirmed that there was a $12,000 cash withdrawal from HARRIS's account at SunTrust Bank on 10/10/07. And when the CW was arrested later on that same date, 10/10/07, he was in possession of several thousand dollars in cash.]

7. On 10/11/07, after being arrested and agreeing to cooperate, the CW agreed to make a consensually monitored phone call to HARRIS. At approximately 9:00 pm, after the CW had called HARRIS and left a message for HARRIS to call the CW, HARRIS's primary bodyguard called the CW's cell phone to discuss when the CW was going to be needed to provide bodyguard services for HARRIS. During this conversation, HARRIS, using his bodyguard's phone, began to converse with the CW. The CW told HARRIS that he, the CW, had "everything for you," referring to the machine guns and silencers he had purchased on HARRIS's behalf. HARRIS replied affirmatively.

8. On 10/12/07 the CW received a consensually monitored call from HARRIS. The CW asked HARRIS when he wanted to take delivery of what the CW had in his possession. HARRIS requested immediate delivery. After the CW told HARRIS he was not available to deliver immediately, HARRIS told the CW he would take delivery Saturday, October 13, 2007. The CW told agents that he and HARRIS were referring to the firearms purchased by the CW for HARRIS on October 10, 2007.

9. Investigation has revealed that HARRIS is a convicted felon, and is prohibited from possessing firearms. On June 1, 1998, HARRIS was convicted of a Violation of the Georgia Controlled Substances Act in the Superior Court of Cobb County, and received a sentence of 7 years probation. HARRIS has additional arrests and at least one probation violation for unlawfully possessing firearms.

10. A check of the National Firearms Registration and Transfer Record showed that there is no record of any machine gun or silencer registered to HARRIS.

11. On October 13, 2007, at approximately 10:08 am the CW left a message for HARRIS to call. Between approximately 12:30-1:00 pm, HARRIS called the CW and asked the CW to bring the items to a (recording) studio. The CW suggested instead, as directed by ATF, that they meet at a shopping center parking lot on the corner of Piedmont Avenue and North Avenue in the city of Atlanta, in the Northern District of Georgia. HARRIS told the CW they could meet in about an hour.

12. At approximately 2:22 pm on October 13, 2007, HARRIS arrived at the pre-arranged meeting location. The meeting was consensually recorded. The CW entered the vehicle HARRIS was driving and displayed the silencers and machine guns to HARRIS. When the CW explained the function of one silencer, HARRIS said "no flash no bang." When the CW showed HARRIS one of the machine guns, HARRIS asked the CW what the "E" position on the selector switch signified. The CW explained that the "E" stood for semi-automatic function and that "you know what the "F" is for." HARRIS acknowledged that he did. "F" stands for fully automatic function. HARRIS inquired about ammunition for the firearm, and asked about the capacity of the magazine. HARRIS asked the CW for "change leftover" from the $12,000 he provided the CW to purchase the firearms. HARRIS was then arrested without incident.

13. A subsequent search located three firearms in the vehicle HARRIS was driving, including one loaded firearm tucked in between the driver's seat and the center console.

14. At approximately 2:40 pm on October 13, 2007, a federal search warrant was executed at HARRIS's house at 429 Creekview Lane, College Park, Georgia. In a walk-in closet in the bedroom identified as belonging to HARRIS, agents found a Colt model AR15 .223 caliber rifle, bearing serial number LE033297, a DPMS model AP4 .308 caliber rifle, bearing serial number 14056, and a Calico model L3 9mm caliber pistol, bearing serial number B004397. Agents have confirmed each of the preceding three firearms were the same as those purchased by the CW for HARRIS on September 6, 2007 and September 26, 2007. Agents also found a Colt .44 magnum revolver, a CAI 7.62 x 39 caliber rifle,

and a Bushmaster 5.56 caliber pistol in the same closet in the same bedroom. Some of the firearms were in the closet, and some were inside the closet inside the safe the CW previously described. Agents also found that five of the firearms were loaded.

15. Title 26, United States Code, Chapter 53 requires that machine guns and silencers be registered with the National Firearms Registration and Transfer Record. Title 26, United States Code, Section 5845 defines the firearms to be registered according to this chapter, and included in section 5845(a)(6) a machine gun and section 5845(a)(7) any silencer. Title 26, United States Code, Section 5861(d), makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." Title 18, United States Code, Section 922(g) makes it unlawful for any person who has been convicted of a felony offense to possess, in or affecting commerce, firearms.

16. All of the firearms recovered were manufactured in whole or part outside the State of Georgia, and, therefore, moved in or affected interstate commerce.

17. Based on the foregoing facts your affiant respectfully submits that probable cause exists to believe that CLIFFORD HARRIS has committed the offense of possession of unregistered machine guns and silencers, in violation of Title 26, United States Code, Section 5861(d); and of possessing firearms in or affecting interstate commerce, after having been convicted of a felony, in violation of Title 18, United States Code, Section 922(g).