1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4  UNITED STATES OF AMERICA,     )
                        )
5       Plaintiff,        )
                        )
6  -vs-                 )  Docket No. 1:07-CR-344-CAP
                        )
7  CLIFFORD J. HARRIS,       )  March 27, 2009
                        )  Atlanta, Georgia
8       Defendant.       )  9:36 a.m.
  _____ )
9

10

11         TRANSCRIPT OF THE SENTENCING PROCEEDINGS
        BEFORE THE HONORABLE CHARLES A. PANNELL,
12            U.S. DISTRICT COURT JUDGE

13

14  APPEARANCES OF COUNSEL:

15  On behalf of the Government:  Todd Alley
                                 Francey Hakes
16                                Office of the U.S. Attorney

17  On behalf of the Defendant:   Steven H. Sadow
                                 Edward Garland
18                                 Donald Samuel
                                 Janice Singer
19                                   Dwight Thomas

20

21     *Proceedings recorded by mechanical stenography*
       *and computer-aided transcript produced by*
22

23           SUSAN C. BAKER, RMR, CRR
              2194 U.S. COURTHOUSE
             75 SPRING STREET, S.W.
24              ATLANTA, GA  30303
              (404) 215-1558
25

2

1          (Proceedings held in Atlanta, Georgia, March 27,

2     2009, 9:36 a.m., in open court, Defendant present.)

3          THE COURT:  Sound Case 07-CR-344, United States of

4     America versus Clifford J. Harris, Junior, set down this

5     morning for sentencing.

6          Is the Government ready?

7          MR. ALLEY:  Government's ready, Your Honor.

8          THE COURT:  Defense ready?

9          MR. SADOW:  Yes, Your Honor.

10          THE COURT:  All right.  The Court has the

11     Pre-Sentence Report and believes at this point there are no

12     objections, and the Court would like to adopt the Pre-Sentence

13     Report and make those the findings of the Court.

14          Is there any problem with that on behalf of the

15     Government?

16          MR. ALLEY:  No objection to that, Your Honor.

17          THE COURT:  On behalf of the Defendant?

18          MR. SADOW:  No objection, Your Honor.

19          THE COURT:  All right.  The guideline calculations in

20     the Pre-Sentence Report will be adopted by the Court.  However,

21     the Court notes that there is a binding plea agreement which

22     the Court has already agreed to impose.

23          At this time I will afford the Defendant and his

24     attorneys any witnesses that they are -- or spokesmen that they

25     wish to use to present in their behalf.  The Defendant has the

3

1  right to make a personal statement to the Court.  And if he

2  wishes to do so, this would be the proper time.

3          How do you wish to proceed?

4          MR. GARLAND:  I will begin, Your Honor.

5          THE COURT:  All right.

6          MR. GARLAND:  May it please the Court.

7          A condition of the plea agreement is that Mr. Harris

8  have complied with all of the terms and provisions of that

9  agreement, and we are now before you with proof which we have

10 submitted in writing and which we want to review somewhat with

11 the Court today of his complete fulfillment of all of the

12 terms and conditions that were imposed in the plea agreement.

13          He had a requirement of performing 1,000 hours of

14 community service.  As of this time, he has performed 1,030

15 hours.  He also has an obligation to remain in home

16 confinement under the conditions of the bond for 365 days.

17 he has completed 305 of those days in home confinement.  He

18 has also abided by each and every provision of the bond

19 condition.

20          During the course of his compliance, he has started

21 paying his debt to society in advance.  He made 262 public

22 appearances before groups, schools, churches and everywhere he

23 was asked.  He was sought out by principals, probation

24 officers, district attorneys and people throughout the United

25 States.  He has flown to different locations and done

4

1   everything in his power to deliver a positive message about the

2   lessons he has learned through his life.

3         His message has been throughout this community

4   service a message of redemption and of atonement and

5   illustrating acts of rehabilitation.  It has been a message of

6   hope, a message of change and a message of redemption.

7         He has delivered that message in a street-level

8   connection by someone who acknowledges his mistakes, but he

9   lays forth in his message that change can take place.  And that

10  message has resonated and connected and inspired thousands,

11  perhaps tens of thousands of youth.

12        There will be no way to measure the positive impact

13  he has had because those people will never become crime

14  statistics.  They won't wind up locked up.  They won't wind up

15  in juvenile courts.  And they will be productive citizens.

16        Thousands of letters and communications have come in

17  detailing the positive impact he has made.  So we ask the Court

18  to accept the fact that he has successfully met the terms and

19  conditions.

20        His message was that it's important to get an

21  education and stay in school, it's important to have

22  self-respect.  He promoted abstinence and safe sex.  He

23  promoted staying away from guns, gangs and violence.  He

24  promoted staying immune to drugs and alcohol, to seek out

25  positive influences, to set goals and be willing to work for it

5

1   and to overcome whatever conditions face a person.

2           Based on that, we ask the Court to accept the fact

3   that he has complied with the conditions and impose the plea

4   agreement that we have submitted.

5           THE COURT:  That's the report I have received from

6   the probation officer.

7           MR. GARLAND:  Your Honor, at this time we would like

8   to call to speak to the Court Ambassador Young.

9           MR. YOUNG:  Your Honor, I want to thank you, thank

10  you for this opportunity to address the Court but thank you for

11  this idea.

12          I have spent my life working against violence.  And

13  from almost 4 years old, growing up in New Orleans I had to

14  deal with white violence.  I lived in a neighborhood with an

15  Irish grocery store on one corner, an Italian bar on the other,

16  and the Nazi party was on the third corner.  And so how you

17  deal with the white violence against me, a young black man, has

18  shaped my life.  I say that's where I became an ambassador

19  'cause fighting and shooting and violence didn't work.

20          But leading that into the Civil Rights Movement, the

21  Civil Rights Movement was in many ways a campaign against white

22  violence in America.  And we get a lot of credit for having won

23  that battle, but that was a battle won by judges.  That was a

24  battle that required the creative decisions of, for me, Judge

25  Brian Simpson down in Jacksonville, Florida; Judge Tuttle here

6

1    in Atlanta; Judge Bell; Minor Wisdom in Louisiana; Frank

2    Johnson.

3            These are really the heroes that put an end to the

4    white violence in the South, and they did it at great sacrifice

5    and suffering.  And we forget that, that the judges that made

6    those controversial decisions on our behalf, their wives were

7    ostracized -- one of them actually had a son that committed

8    suicide because of the pressure that was put on his family --

9    and those are the stories that the press doesn't know and

10   doesn't tell.

11           But in achieving that level of victory in the first

12   50 years of my life, I realize that there was more black

13   violence in our society and that it was perhaps now more

14   dangerous to the community than the white violence had been.

15   And I have been looking for ways to deal with that.  I don't

16   turn down opportunities to go to schools, and I meet with kids

17   anywhere about anything.  But I wasn't getting very far.

18           And when I got a call from Dr. Joyce Wilson who's

19   done a Ph.D. study in hip hop at University of Georgia, one, I

20   was fascinated that University of Georgia would give a Ph.D. in

21   hip hop and education; but when she asked me would I talk to

22   this young man who I had read about in the newspapers and could

23   I help him, I never thought of it as me helping him.  I

24   realized that maybe this was an opportunity that he could help

25   me in doing what I had been trying to do in my ministry, and

7

1    that is deal with black-on-black violence in almost every

2    aspect of our society.

3         And black violence comes from the same roots and

4    frustration and poverty and hopelessness that white violence

5    came from, but we have not been able to get a handle on it.

6    When these young people in this hostile community began to do

7    their music, they touched a chord.

8         I wrote a religious book, and it was in a religious

9    book store in New York in about 1992 or '3.  And Tupac Shakur

10   came in the book store to see me and to ask me if we could get

11   together sometime.  And I gave him a copy of my book and my

12   phone numbers, and we were to get together when he came back to

13   Atlanta.  He never made it back to Atlanta.  He was killed.

14        And I dropped my efforts to reach out to these young

15   folks and began to work more on Africa after the Olympics.  But

16   in working with T.I., we hit it off immediately -- not like a

17   son because my son's old, my children are a lot older -- it was

18   a grandfather kind of relationship.  And most of us don't

19   listen to our parents, but all of us listen to our

20   grandparents.  And so we had a unique kind of situation which I

21   don't think either of us planned.

22        I was going to New York to a hospital, a benefit for

23   Goldwater Hospital in New York.  And I said, you know, maybe if

24   you can come with me you might see what we are talking about.

25   Because Goldwater Hospital has 2,200 people who are

8

1    paraplegics; and at least 60 percent of them, black, white,

2    Hispanic, are there totally paralyzed because of gun violence.

3            And it just happened that he was going to New York,

4    so we went together.  And we went through the hospital, and he

5    heard the testimonies of the guys who were in their 50's and

6    60's who talked about being shot in the back when they were 16

7    and been laying in these beds and dealing in these wheelchairs.

8    The wheelchair charities was really started by a group of kids

9    who started having benefit basketball games to buy computerized

10   wheelchairs and beds for their buddies who had been shot.  And

11   it just seemed like it was the perfect message for us to share.

12           So we took pictures of it, and we made a short movie

13   which has gone to about 87 stations around the country.  And

14   it's played on the Armed Forces Television Network in 158

15   countries.  It's estimated that it may have reached an audience

16   in the neighborhood of five million because we get the stations

17   that want to reach out to the black community.

18           And so it's been a phenomenal experience for me in my

19   ministry, and that wouldn't have been possible without the

20   willingness of this Court to try some new things.

21           But I'm not a judge.  I don't know anything about

22   judging.  I'm a preacher.  And yesterday I went to the First

23   Baptist Church on Hamilton Homes in Simpson thinking I was

24   going to talk to a group of kids and not knowing why.  But one

25   of our local judges had helped to gather over a thousand young

1    people there.  And the reason they were listening to me was

2    they had showed this picture that we had made of me with T.I.,

3    and they asked questions.

4              And the reason Judge Thomas had all these kids

5    together was that we had two stabbings in our high school this

6    week, and we had a shooting at a teenage party this last

7    weekend.  And, now, the high school stabbing was in one of our

8    experimental, top-level, college-preparatory high schools.  The

9    shooting was in an upper-class neighborhood where the houses

10   start at a half a million and go up.

11             This is not a -- it's really not an individual

12   situation.  It's not anymore a ghetto phenomenon.  There is a

13   serious kind of threat to violence in America that's equivalent

14   to the threats that came from the Ku Klux Klan that together

15   with the courts I think we put an end to.

16             And one of the other films we made was a film about

17   the University of Georgia which showed the University of

18   Georgia in the 1960s with a flare-up that we had there.  And

19   then Charlene Hunter came back with us to the University of

20   Georgia and met with students.  And my granddaughter happens to

21   be a junior at the University of Georgia.  And for them to

22   think to talk together, black and white students at Georgia,

23   about how we got over is really a miraculous story.

24             We need to find a way to produce another one of those

25   miracles and help lower the level of violence and eliminate as

10

1  much violence in our society as we can.  And I think what you

2  have done here in this court has put us in a step in the right

3  direction, and I just say thank you very much.  It's been a

4  wonderful experience for me, but I don't intend to stop.  And

5  we haven't hardly made a dent in it yet.

6        But I'm -- I turned 77 last week, week before last.

7  And all the young vitality and energy that we can rally in

8  support of this cause and all of the judiciary that will

9  understand that we are not just dealing with individual crimes

10  anymore but we are dealing with systemic violence in our

11  society, the more we can get to understand the depths of the

12  problem I think the quicker we are going to solve it.

13        And looking at Atlanta, when people stop fighting we

14  understood a city too busy to hate pretty soon becomes a city

15  that's prosperous and successful and most of the time even

16  loving.

17        And I thank you very much, sir.

18        THE COURT:  Thank you.  Thank you, Ambassador Young,

19  for your comments and your public service and your ministry.

20        MR. SADOW:  Your Honor, with the Court's permission,

21  Dwight Thomas would like to address the Court briefly.

22        THE COURT:  Certainly.

23        MR. THOMAS:  Morning.  May it please the Court.

24        Your Honor, I have been in this case from the onset

25  from Mr. Harris's arrest.  What he did was wrong, what he did

11

1  was illegal, and in no way can be condoned.  But out of

2  something bad came something good.

3       There's an old biblical saying, To whom much is

4  given, much is expected.  And in this particular situation,

5  Mr. Harris has lived up to the expectations of the Court, of

6  society and for law enforcement.

7       Mr. Harris set out upon a course of redemption for

8  himself, for society and for the rule of law.  It was made

9  possible by the exceptional willingness of the U.S. attorney,

10  Mr. Nahmias, not to just serve -- not just to talk the public

11  servant talk but to walk the public servant walk.  It was also

12  made possible, as Ambassador Young said, by a Court that was

13  willing to temper justice and trust Mr. Harris to conform his

14  conduct to the rule of law.

15       About this time last year, Your Honor, Mr. Harris was

16  able to impact approximately 40,000 people at a service held

17  here in the Georgia Dome under the auspices of Bishop Eddie

18  Long of the New Birth Church out in DeKalb County.  That began

19  that road to redemption.  And since that time, as Ambassador

20  Young has indicated, thousands more have been impacted in a

21  positive and productive way.

22       Your Honor, I want to take the opportunity to have

23  Bishop Eddie Long to come forward, speak to this Court on

24  behalf of Mr. Harris.  And at this time I ask him to come

25  forward with the Court's permission.

12

1          THE COURT:  Yes, sir.

2          MR. THOMAS:  Mr. Long?

3          MR. LONG:  Thank you, Your Honor.

4          I would like to concur with all that has already been

5    said, and I appreciate this opportunity to speak on behalf of

6    Mr. Harris and the relationship I have had with him even prior

7    to this.

8          And a statement that comes to my heart and my spirit

9    is one of the greatest requirements the Lord ever asked he said

10   is to do justice, love mercy and walk humbly with your God.

11   And I thank you for doing justice, I thank you for loving

12   mercy, and I thank you for allowing all of us the opportunity

13   to walk humbly.

14         I am deeply, deeply impressed in this wonderful

15   opportunity that has been presented by this Court to allow

16   someone to do even a greater job than probably Dr. Young and

17   myself.  Because we give sermons, but the best sermon I ever

18   heard that was the most effective was one not really heard but

19   seen.  You have allowed a community, a city to witness a

20   transformation, to not put someone under cover but to put them

21   out in the open who has repented, who stands boldly but with

22   humility and admits to the things that he has done wrong but

23   yet challenges all of us to stand up and face your issues and

24   to move forward.

25         I will never forget the Easter service where I guess

13

1    I was probably overshadowed because he was so bluntly honest

2    and able to stand and not only impress the young people but

3    adults alike, over 40,000 folk, to sit there and to really deal

4    with the situations that you are confronted with and to be

5    honest with life, be honest with where you are because you

6    cannot move forward until you start from where you are.  And so

7    I am deeply indebted to him for just confronting all of us to

8    be honest, to be transparent, to look at where you are and make

9    the right corrections and to move forward.

10            I am honored to be able to stand here and commend

11   this Court, commend those who are participating in all this

12   process that you have changed the city.  You have not only

13   changed the city, you have changed the state.  You have changed

14   a lot of people around this country because of someone who had

15   an impact and influence not just with young people -- and I am

16   personally witnessing the thousands there that continue to

17   talk, continue to move and continue to move and face their

18   problems and challenges and change their lives.

19            But I am not only talking about the young people who

20   Mr. Harris had an influence and impact on.  I am even talking

21   about adults who sometimes need someone younger to be able to

22   come stand before and say, This is it, this is what I did, this

23   is what has to be done, and I'm going to move forward.

24            So in all that, I want to thank the Court.  I want to

25   thank you for choosing a young man that is truly an example

14

1   even in the wrongdoings that he could stand and say, yes, I was

2   wrong, but I'm ready to make it right and will stand and not

3   try to hide anything but yet let us see a process -- because

4   sometimes it does take a process -- a process for us to get

5   from one place to another and to see the struggles, to see the

6   pain and to see the sacrifice, to see mercy at its best and see

7   justice still executed where we cannot live in a lawless

8   society but yet we do have options and ways to be able to

9   improve life not just for one but for many.  And for that I am

10  truly thankful.

11          And I am truly thankful for the many lives that I

12  stand here and represent who have been changed and I know for a

13  fact have been changed that you will never see in a court

14  system.  You will never see them in the back of a police car.

15  You may see them sitting at a bench just like you legislating

16  justice, mercy and humility.

17          God bless you, and I thank you.

18          THE COURT:  Thank you.

19          MR. SADOW:  And, again, with the Court 's permission,

20  Clifford Harris, also known as T.I., would like to address the

21  Court.  And then I will have some very short, brief closing

22  remarks.

23          THE COURT:  That will be fine.

24          THE DEFENDANT:  Good morning, Your Honor.

25          THE COURT:  Good morning.

15

1          THE DEFENDANT:  Today I suppose I would like to

2     explain my position to those that don't understand it.  I would

3     also like to say thank you to some and apologize to others.

4          Now, in my life, I have been placed in positions

5     where I had to take the worst-case scenario and transform it

6     somehow and make the best-case scenario out of it.  Growing up,

7     although I did not know I was poor, I was.  And although I did

8     not know what welfare meant, I was on it.

9          But I took those circumstances, and I took those

10    conditions, and I had an extreme ability to retain information

11    from schools.  And I was always very great at reading and

12    phenomenal with math, and my performance in school was always

13    superlative.

14          I took that with my ability to relate and speak the

15    language of my peers and the people who came from the same

16    conditions as me, and I infused those talents together and

17    began to make music.  I started this process at about 8 or 9

18    years old.  From then I grew up and I had not much guidance,

19    not much -- not much advice on what to expect in my

20    transformation from becoming -- from growing from a boy to a

21    man.  So most of the things that I learned, most of the things

22    that I know had been taught from trial and error.

23          Now, in this trial and error, I get -- how should I

24    say -- information that I can use now in my music.  I learned

25    lessons that I now can put in my music hopefully to teach

16

1   others what I have learned without having to go through what I

2   have gone through.  And I have been able to do this in a way

3   that has touched people who may not have thought of things the

4   way that I have or put it on their minds to think or believe.

5         Now, in the process, I have also had a lot of people

6   who envied my position that may not have wished me as much

7   congratulations as other positive people may have.  Through it

8   all, I still maintain my belief in a power greater than me,

9   that I have been placed here for a purpose, for a reason, that

10  my talents have not gone to waste, that I have an ability to

11  not only reach those that I don't know but I have an ability to

12  reach those that come up under me.

13        I have gotten in a lot of trouble.  I have gotten

14  into a lot of trouble from the time I was 15 years old.  I've

15  done everything from sell drugs to drop out of school to carry

16  firearms.  And I have done all of this out of a sense of not

17  knowing at the time, and by the time I knew better it was

18  clearly a sense of habit and concern for my well-being.  I knew

19  no other way to protect myself, to defend myself from others

20  that meant me harm than to arm myself.

21        Now, had it not been for the trouble that I had

22  gotten into previously as a youngster, perhaps I could have

23  armed myself legally.  And I would have had -- I would have

24  been able to take -- I would have been able to take advantage

25  of my right as a citizen, my constitutional right as a citizen

1   to bear arms had it not been for my felonies as being a

2   youngster.

3           But it's more important to me to take this situation

4   and to take my life and take my experiences and use it so my

5   cousins that come up under me, my little brother that's coming

6   up under me and the others that look up to me who don't know me

7   can take my experiences and use them so I can break the cycle,

8   at least in my family.

9           Since me, no one has been arrested.  Since me, no one

10  has dropped out of school.  Since me, no one has had any of the

11  problems, any of the troubles that I have had as a youngster

12  coming up because I have seen to it that that hasn't happened.

13          When I said I wanted to thank some, I want to thank

14  you, Your Honor.  And I want to thank the U.S. attorneys,

15  Nahmias, Ms. Hakes, Ms. Yates, Mr. Alley.  I want to thank you

16  guys for your vision because I know that you have faced extreme

17  scrutiny, and this opportunity that you have given me has

18  caused some to have adverse opinions of you.  And I want to

19  thank you.

20          And it means just as much to me to make you guys

21  proud in what you have done as it does for me to make my

22  attorneys, Mr. Young, Bishop Eddie Long, Reverend Dan Edwards

23  and others who have come to support me and stand behind me.  It

24  means just as much to me to make you guys proud of your

25  decision as it does for me to make myself, my loved ones and my

18

1   family proud as well.

2         Because I am a man of integrity.  I am a man of

3   morals, standards and principles.  I know it's very, very

4   difficult to know, understand and believe that looking at my

5   criminal history.  But everything that I have done, although it

6   was wrong, it was done in my mind out of not knowing, out of my

7   own ignorance and out of my own misunderstanding.  It was done

8   to do something that I felt was right.

9         Now, I would like to apologize at this time to my

10  mom, my fiancée, my uncles, my aunts, my little cousins, my

11  brother, because in my wrong -- and not only them, I also would

12  like to apologize to the young kids that I mentor because in me

13  trying to do the right thing the very same people I was

14  attempting to protect -- because after an attempt has been made

15  on your life, after shots have been fired at your person, after

16  your best friend has died in your arms, your judgment is

17  somewhat jaded.  And some things that you may not have done

18  before you rationalize and make sense of it to do.

19        So I would like to apologize to them because the very

20  people that I set out to protect now at least for a year and a

21  day I will be helpless and I will have no reason -- or no means

22  to protect them.  I just hope that -- well, I have faith that

23  God will look over them as he has looked over me.

24        And I just want to let you know that this has truly

25  been an insightful moment in my life.  And I have taken great

19

1    lessons from this period of my -- this chapter in my life.  And

2    I will use it moving forward to help others.

3              And I don't want to take too much of the Court's

4    time.  I just want to say thank you to you guys.  I want to

5    apologize to you guys.  And with that being said, I bid you

6    farewell.

7              Thank you.

8              THE COURT:  Thank you.

9              MR. SADOW:  If I could conclude, and I promise I will

10   keep it very short.

11             One of the problems with speaking after all you good

12   speakers come before the Court is that they take all the ideas

13   and thoughts and already say it better than I would.  But in

14   about a minute I wanted to give this Court and the Government

15   reason to understand how significant this has been, and maybe

16   this is for the community a little bit to understand.

17             There's been a lot of talk about plea bargaining and

18   plea negotiation in this case, and I don't think the community

19   really understands how that goes about.  You know, the defense

20   has an idea that maybe, maybe with the conduct of T.I. and the

21   notoriety and celebrity status that maybe we can do something

22   better than simply send him to jail.  And that idea was shared

23   with the United States Attorney's Office from Ms. Hakes all the

24   way up to Mr. Nahmias.

25             And the U.S. Attorney's Office could have at that

20

1   point in time just looked up and said, You know what, that's a

2   nice idea, but we are not going to even consider it.  I mean,

3   with the criminal history and background of T.I., they would

4   have been well within their rights to do that.  But they

5   didn't.  They didn't have to.  But they said let us give it

6   some thought and see if we can turn this into something

7   positive, and they did.  And they worked out something with us

8   that we thought was reasonable all the way around.

9         But that in and of itself wasn't enough.  We had to

10  go to one other party, so to speak, and that was Your Honor.

11  And as everyone in this courtroom knows that's part of the

12  legal system here, this was not an easy decision to make.

13        And the Court based on background and information

14  could easily have said, I appreciate the fact that y'all have

15  come together with this idea, but I'm just too skeptical to

16  give it a chance.  But you didn't.  You gave us the opportunity

17  to prove to you and, more importantly, to T.I. to prove to you

18  that this was a phenomenal possibility and maybe, just maybe we

19  could make a difference.  And now we are here a year later.

20        And I have a letter that was written dated March 26,

21  2009, that I received this morning.  And I received it from

22  folks that are associated with the MTV program that T.I. has

23  been doing, "Road to Redemption".

24        And for those that have not had an opportunity to see

25  the show, you've missed something because it really does impact

21

1    not just the person that's being focused on and give an

2    individual but hundreds of thousands of other individuals.

3            How many hundreds of thousands?

4            Based on viewer statistics that I have been able to

5    put together, there have been millions and millions of people

6    that have watched this show.  So the whole goal here was to get

7    to as many people as we could with the message.  The MTV show

8    for which he did not receive community service credit is just

9    another way that he was able to reach out.

10           And there was one individual on that show apparently,

11   and I don't remember if I saw this episode or not.  But his

12   name was Anthony; and he was a problem, at-risk youth in the

13   Los Angeles area and apparently was on probation at the time.

14   And his probation officer was a woman by the name of Kimberly

15   McKinney.  She is the one that authored this letter.  And she

16   says it better than I could ever have thought about it, so I

17   want to tell you just a little bit of what she said.

18           What she said was that she had learned in life that

19   in many times we experience challenges not so much for

20   ourselves but those who are watching us which is exactly what

21   T.I. just said and that the current circumstances that T.I. has

22   undergone creates a powerful, timely social document that is in

23   the process of changing the lives of so many people, both young

24   and old.

25           Again, she is the probation officer of Anthony.

22

1        Anthony is an awesome youth with a bright future

2   because he has made -- because T.I. has made a tremendous

3   impact on his life.  For that she says thank you and that the

4   youth without a voice for which he now can speak, that that

5   program was incredibly enlightening and is tuning in people

6   that had so far tuned out in the youth community.

7        And she ends by saying this, and I think it sums up

8   everything that's been said today.  It says her entire

9   caseload, the youth at her church and in my community, friends

10  and family watched the show faithfully.  If she had to select

11  two words that she heard most often, all these people

12  describing the program and what T.I. has done for the

13  community, those two words would be life-changing.

14       That was the goal, the ultimate objective of this

15  deal.  It's maybe too early to tell how many lives have been

16  changed.  But as Mr. Nahmias would repeatedly say, even if we

17  could change one life, that's one person that we wouldn't have

18  to worry about in the future.

19       I think we have changed hundreds, if not thousands,

20  of lives and as a result of the Government, this Court, more

21  importantly, T.I. living up to his responsibility, and I ask

22  the Court to consider that when it imposes a sentence.

23       THE COURT:  Thank you.

24       Would the Government like to be heard?

25       MR. ALLEY:  Your Honor, we just wanted to put on the

23

1    record that the Defendant has, in fact, complied with all of

2    the provisions of his bond, all the terms of the plea

3    agreement.  And he has performed -- in fact, I would say

4    exceeded expectations in the performance of his community

5    service.  And we would simply ask the Court to sentence the

6    Defendant pursuant to the terms of the binding plea agreement.

7              THE COURT:  All right, sir.

8              Well, if there's nothing further, I will proceed with

9    the sentence.

10             Pursuant to the Sentencing Reform Act of 1984 and the

11   binding plea agreement, it's the judgment of the Court that the

12   Defendant, Clifford J. Harris, also known as Charles Harris, is

13   hereby committed to the custody of the Bureau of Prisons to be

14   imprisoned for a term of one year and one day on each of Counts

15   1, 2 and 3 to run concurrently with each other.

16             It's further ordered that the Defendant pay to the

17   United States a special assessment of $300 that'll be due

18   immediately.  It's further ordered that he pay to the United

19   States a total fine of $100,000 on Counts 1, 2 and 3.  And the

20   fine shall be paid in full immediately on the date of

21   sentencing.

22             It is ordered that all the Defendant's right, title

23   and interest to the property identified in the Order of

24   Forfeiture be incorporated herein by reference; and that

25   property is hereby forfeited.

1          Upon release from imprisonment, the Defendant shall

2    be placed on supervised release for a term of three years on

3    each of Counts 1 through 3 to run concurrently.  Within 72

4    hours of release from the custody of the Bureau of Prisons, the

5    Defendant shall report in person to the probation office in the

6    district to which he is released.

7          While on supervised release, he shall not commit

8    another federal, state or local crime, comply with the standard

9    conditions that have been adopted by the Court and these

10   additional conditions:

11         One, he shall submit to a drug urinalysis within 15

12   days after being placed on supervision and two periodic tests

13   thereafter.

14         Two, he shall participate in a drug/alcohol treatment

15   program under the guidance and supervision of the United States

16   probation officer and if able contribute to the cost of the

17   services of that program.

18         Three, he shall complete a total of 365 days in home

19   detention that he is credited as of today with 305 days of that

20   service.  And he shall be -- well, that was a part -- he is

21   credited with that in his home detention under the home

22   detention program while on bond.  He shall receive credit and

23   participate in that program under the same conditions as in the

24   pretrial home confinement.

25         Four, he shall perform 100 -- I'm sorry -- 1,500

25

1    hours of community service.  To date he has credit for 1,030

2    community service hours which he has performed since his guilty

3    plea on March 27th, 2008.

4           He shall continue to receive credit for community

5    service hours earned during any period of voluntary surrender.

6    The 1,500 hours community service will be calculated in the

7    same manner as it has in the past while he has been on bond and

8    under the conditions of bond.

9           Five, he shall make full and complete disclosure of

10   his finances and submit to an audit of financial documents at

11   the request of the probation officer.

12          Six, pursuant to the code section that requires

13   mandatory DNA testing, he shall cooperate in the collection of

14   DNA as requested by the probation officer.

15          Seven, he shall not own, possess or have under his

16   control any firearm, dangerous weapon or other destructive

17   device.

18          Eight, he shall submit to a search of his person; his

19   property, real and personal; his residence; office; place of

20   business or any vehicle at any reasonable time in a reasonable

21   manner at the request of the probation officer.

22          Mr. Harris, do you understand the sentence?

23          THE DEFENDANT:  Yes.  Yes, Your Honor.

24          THE COURT:  The Court will state that the sentence is

25   imposed and pursuant to the binding plea agreement.  The drug

26

1   testing under the statutes is mandatory.  Drug counseling is

2   imposed because of his substance abuse history.  The fine and

3   community service and home confinement are part of the binding

4   plea agreement.

5           The Court believes this was an experimental sentence

6   in the Court's mind, but the Court believes that the sentence

7   promotes respect for the law.  It has been a successful

8   experiment so far.  It provides deterrence to others, and it

9   protects the public.  And the way it's been handled saves the

10  taxpayers money in not having to incarcerate you any more than

11  the Court believes necessary.

12          The Court believes that the sentence fulfills most of

13  the requirements or the considerations in Section 3553(a) of

14  the United States Code, Title 18.

15          Is there any objection by either side to the ultimate

16  findings of the Court, the guideline calculations, to the

17  sentence or to the manner in which it's been pronounced on

18  behalf of the Government?

19          MR. ALLEY:  No objection.

20          THE COURT:  On behalf of the Defendant?

21          MR. SADOW:  No, Your Honor.

22          THE COURT:  Now, your attorneys have asked on your

23  behalf two things:  One, that I recommend incarceration near

24  Atlanta for the benefit of your family.  And I will do that.

25  The Bureau of Prisons is not required to follow my

27

1    recommendation, but I think you are better off with that

2    recommendation than not.  And I will incorporate that language

3    in the judgment.

4            Also, I know of no reason to deny you voluntary

5    surrender.  And I will instruct the Bureau of Prisons that you

6    will not be required to voluntarily surrender before May the

7    19th as I understand you have certain family commitments to

8    include Mother's Day and a birthday.  Plus, I think there are

9    times when sending you a notice that they have a bed space open

10   now is about six to eight weeks.

11           I appreciate all the things that have been said about

12   really the courage and wisdom of the Court; but the Court would

13   not have undertaken this without the recommendation of the

14   United States attorney, Mr. Nahmias.  I think it's been a good

15   experiment.

16           I have been on the bench a good many years, and I

17   have come to resist the lockup mentality that we now find

18   ourselves in of just locking up a large portion of our

19   population.  I hope this sentence and this experiment might

20   lead to other experiments where we can do things to protect the

21   public and promote our system of laws without having to destroy

22   lives and destroy families.

23           So your debt of gratitude is not only to the Court

24   but particularly to the United States Attorney's Office and

25   Mr. David Nahmias for having the courage to do it.  And I

28

1    congratulate you on the year and the work that you have done so

2    far.

3              If you had failed, I would have simply sent you to

4    prison.  I would have probably hung Mr. Nahmias out the window

5    from the 23rd floor.

6              All right.  Gentlemen, let me advise Mr. Harris of

7    one other thing.

8              You have the right to appeal.  If you believe your

9    guilty plea was somehow unlawful or involuntary or there's some

10   other fundamental defect in the proceeding that was not waived

11   by your guilty plea or if you think your sentence is contrary

12   to the law, you have the right to appeal.

13             With few exceptions, your notice of appeal must be

14   filed within ten days of the judgment being entered in this

15   court.  If you are unable to pay the cost of an appeal, you may

16   apply for leave to file your appeal without paying costs.  And

17   if you request, the Clerk of Court will prepare and file a

18   notice of appeal on your behalf.

19             Do you understand your right to an appeal?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Is there anything else I need to take up

22   in Mr. Harris's case?

23             MR. ALLEY:  Nothing from the Government, Your

24   Honor.

25             MR. SADOW:  No, sir.

29

1          THE COURT:  We will be in recess.

2          (Proceedings adjourned at 10:23 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30

1                           C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT:

4     NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7     29, are a true and correct copy of the proceedings in the case

8     aforesaid.

9              This the 7th day of May, 2009.

10

11

12

13            _____

14            Susan C. Baker, RMR, CRR
              Official Court Reporter
15            United States District Court

16

17

18

19

20

21

22

23

24

25